Filed 5/5/23 P. v. Villasenor CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICARDO VILLASENOR,<br><br>    Defendant and Appellant. | F082847<br><br>(Super. Ct. No. LF012047A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Charles R. Brehmer, Judge.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Ricardo Villasenor was charged in counts 2, 3, and 4 with assault with a firearm (Pen. Code, § 245, subd. (a)(2))[1]; in counts 5, 6, and 7 with false imprisonment by violence (§ 237); in count 8 with active participation in a criminal street gang (§ 186.22, subd. (a)); and in count 9, with misdemeanor carrying a concealed weapon (§ 25400, subd. (a)(1)). It was alleged that the charged felonies were for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and involved personal use of a firearm (§ 12022.5, subd. (a)).[2]

A jury found Villasenor not guilty of the assault with a firearm charges, but guilty of the remaining charges and the alleged enhancements were found true. Villasenor was sentenced to 12 years in prison, consisting of nine years for count 5 (the middle term of two years, plus three years for the gang enhancement and four years for the gun enhancement) plus three years consecutive for count 6 (one-third the middle term of eight months, plus one year for the gang enhancement and 16 months for the gun enhancement). On count 7, the trial court imposed nine years (the middle term of two years, plus three years for the gang enhancement and four years for the firearm enhancement), to be served concurred with count 5. On count 8, the trial court imposed but stayed 6 years (the midterm of two years plus four years for the firearm enhancement).[3] On count 9, the trial court imposed a concurrent 180 days in jail.

On appeal, we reject Villasenor's claims that the trial court erred when it admitted statements of an earlier incident in violation of *Miranda*[4]; when it denied his motion for

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Codefendant Daniel Ulloa was charged with the same seven felonies, gang and gun enhancements, plus attempted murder in count 1, along with various gang and gun enhancements. Ulloa has filed a separate appeal (case No. F082814).

[3] The minute order is incorrect as to count 8, but is correct in the reporter's transcript.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

mistrial; when it denied his motion to bifurcate the gang enhancements and sever the gang allegation from the substantive offenses; and when it did not allow the defense to question the immigration status of the victims. We disagree that he received ineffective assistance of counsel and that there was insufficient evidence of the gang enhancements under law as it existed at the time. We agree that the gang enhancement allegations and gang substantive offense must be reversed in light of newly amended law and remand to allow the prosecutor to retry those allegations. We also agree that remand is necessary to allow the trial court to use its discretion in sentencing Villasenor pursuant to newly amended sections 1170 and 654. We find no cumulative error and in all other respects affirm.

## STATEMENT OF THE FACTS

### *July 26, 2018, Incident at the Corral*

On July 26, 2018, Luis S. and brothers Roberto H. and Juan H. went to a corral on Fallbrook Avenue in Arvin so that Roberto could tend to his chickens. Luis and Juan helped Roberto maintain and clean the area where the chickens were kept.[5] After they finished cleaning, the three continued to talk and drink.

Villasenor came over with one or two others from an adjacent stall in the corral and joined them in drinking beer. At some point, Villasenor left and returned with Ulloa. Villasenor showed off a firearm, which he unloaded and reloaded. The men were arm wrestling. Some of the men attempted to make the loser pay for more beer, but not all agreed to that. According to Roberto, Luis won all the matches. But after one of the matches, someone claimed Luis lost and owed them more beer. Luis, Roberto and Juan were ready to go home. Luis did not want to pay for more beer, so declined and prepared to leave with Roberto and Juan.

---

[5]     There was conflicting evidence at trial as to whether the men were engaged in rooster fighting, which is not relevant to incident at issue.

3.

Suddenly, Ulloa hit Luis in the jaw with a closed fist.  Roberto then hit Ulloa once, after which Villasenor hit Roberto in the face.  Roberto tried to defend himself, but Villasenor kept hitting him.  When Luis went over to Ulloa to try to find out why he had hit him, Ulloa pulled out a gun and pointed it at Luis's chest.  Luis ran and hid.  Ulloa ran out of the area.

Roberto and Villasenor stopped fighting, and Villasenor made a phone call and then told Luis that Ulloa would come back to fight him.  Luis, Roberto and Juan wanted to leave, but Villasenor stood by the exit with his gun "pointing it but lower down," and told them they had to stay to fight Ulloa.

When Ulloa returned a few minutes later, he brought Loreto Mosqueda[6] with him. Ulloa pointed at Roberto and said, "It's him," and Mosqueda then started hitting Roberto in the face.  During the fight, Ulloa moved behind Roberto and tried to shoot him in the back, but Luis intervened.  Villasenor still had the gun in his hand and told Luis and the others not to get involved in the fight.  Luis was told that, if he did, Ulloa would "fill [him] up with bullets."

Ulloa then turned towards Luis and pointed the gun at his chest.  Luis pushed Ulloa's arm down to lower the gun, but Ulloa fired the gun, missing Luis.  Luis ran and hid.

Within a few seconds, Ulloa pointed the gun at Roberto, who had Mosqueda on the ground.  Roberto attempted to get Ulloa to calm down, but Ulloa shot Roberto in the leg, which broke the leg.  Villasenor, Ulloa, and Mosqueda then fled.  Roberto told his brother Juan to call 911, but Juan did not speak English, so Roberto then told Juan to call Jose Cisneros, the owner of the corral, who in turn called 911.

---

[6]     By the time of trial, Mosqueda was deceased.

Juan showed police officers a cell phone video recording of the men arm wrestling.[7]  One of the officers,  who had been a resource officer at Ulloa's middle school from 2013-2017, recognized Ulloa in the video.  When officers spoke to Luis after the incident, Luis did not know if the perpetrators were gang members,  but he referred to them as gang members.

Two spent .45-caliber shell casings were found on the ground in the corral area.

Officers were provided a license plate of a vehicle associated with the suspects, and Villasenor was arrested at a gas station three hours after the incident.  A search of Villasenor's vehicle turned up a black baseball cap with "Arvin" on it, two cell phones, a live .40-caliber bullet, and a loaded .40-caliber pistol.

Ulloa was arrested on October 3, 2018, by the U.S. Marshals Fugitive Apprehension Team.

*The Arvina Gang*

Gang expert Officer Ryan Calderon testified that the only active criminal  street gang in Arvin is Arvina, also known as Arvina 13, Arvin 13, Arvin Poorside, and Poorside Locos.  Calderon testified that gangs commit crimes to instill fear, which obstructs rivals or citizens from reporting the gang's activity.  Gang members  gain respect by committing crimes.

Officer Calderon described the Arvina gang as a southern Hispanic gang whose rivals are the northern Hispanic gangs.  Arvina's main rival is the Lamont 13 gang. Arvina members commonly wear dark blue, and often display the letter A and number 13. Arvina's primary activities include felony vandalism, felony assault, narcotic sales, vehicle theft, burglary, grand theft, illegal possession of firearms, assault with deadly weapons, attempted murder, and killings.

---

[7]    The video was played for the jury.

5.

Officer Calderon testified that he came into contact with Arvina members about 10 times a week, making him familiar with gang clothing, signs, tattoos, their criminal histories and personal lives. Calderon had personally investigated at least 100 crimes committed by Arvina members.

Officer Calderon testified that a person could become an Arvina gang member by being "jumped in," which involved committing a crime, or by being "born into the gang," by family members already in the gang. Calderon opined that Arvina was an active criminal street gang at the time of the July 26, 2018, incident.

*Gang Evidence Regarding Villasenor*

The prosecution presented evidence of at least 11 prior crimes and/or gatherings involving Arvina gang members. Only one incident, in September of 2014, involved Villasenor.

On September 3, 2014, Joe Martinez, Jesse Ruiz, and Villasenor were at Alshaif Market (at times referred to as camel store or market). Ruiz was 14 years old at the time; Villasenor was 17. Martinez, who went by "Shadow" and was wearing a black baseball hat with the letter "A", approached a man who had an "LA" tattoo and asked where he was from. A fight ensued and the male was stabbed, suffering injuries to his nose, both arms, left shoulder, and back.[8]

Officers contacted Villasenor the following day, and he explained that a friend had asked the man where he was from, a fight started, and he got involved. Villasenor declined to name the friend. Villasenor had an "A" tattooed on his left hand, which he said he had gotten the previous day. Villasenor claimed not to know what the "A" meant, but agreed that the Arvina gang represented with the letter A. Villasenor said he was not affiliated with any gang, but confirmed that he was friends with Martinez.

---

**8**    The jury was admonished that Villasenor did not possess any weapons at the time or stab anyone.

Villasenor allowed officers to search his cell phone. The night of the stabbing, "Lil Isac Wyno" had texted Villasenor that somebody had been jumped at the market. Villasenor responded, "We jumped him, ese, haha." Later that night, another individual texted Villasenor and asked who let him "do the A." Villasenor responded, "I put in work and Posadas did them for me." In response to further inquiries, Villasenor sent texts indicating he, "Jay" and Martinez had "pop[ped] the fool from L.A.," at the market.

Officer Calderon believed Martinez and "Lil Wyno" were active members of the Arvina gang at the time.

At the time of trial in this matter, Villasenor no longer had the "A" tattoo on his hand. When photographed before trial, he had numerous other tattoos, including a water tower with the letter "A" and the word "Poorside" and another tattoo with the letter "A" and "Poorside." Officer Calderon believed these tattoos, and the fact that some were obtained after 2018, were consistent with ongoing membership in the Arvina gang.

Officer Calderon opined that Villasenor was an active participant in the Arvina gang on July 26, 2018. His belief was based on the 2014 incident, Villasenor's tattoos, the fact that the crime at the corral was committed with other gang members, and the location of the crime in Arvina territory.

*Gang Evidence Regarding Mosqueda*

Officer Calderon had contacted Mosqueda 10 to 15 times.

On May 7, 2008, Mosqueda, Javier Lopez, and Andrew Carrera were contacted while drinking outside of Lopez's residence. All three had gang monikers, and Officer Calderon believed Lopez and Carrera were Arvina gang members at the time.

On July 28, 2008, Mosqueda was contacted in the presence of Jose Moreno, Alfredo Cardena, and Leonel Nunez. Officer Calderon was familiar with the crimes Moreno, Cardenas, and Nunez were suspected of committing and believed all three were Arvina gang members.

On January 22, 2009, Mosqueda left the residence of Alejandro Diaz, with Manual Pantoja in his car. Officers stopped Mosqueda, searched Diaz's home, and found a stolen vehicle, a large quantity of methamphetamine, and indicia of drug sales. Officer Calderon believed Pantoja was an active Arvina gang member at the time, but not Diaz.

On December 28, 2013, officers stopped a vehicle driven by Mosqueda; Edwardo Mosqueda, Pantoja, Oscar Partida, and Fabian Zuniga were also in the car, along with three loaded firearms, gloves, bolt cutters, and a hammer. Mosqueda had numerous Arvina gang tattoos, and officers believed Zuniga, Pantoja, and Partida were active Arvina gang members at the time.

On July 28, 2014, Mosqueda was in his garage when Miguel Arrendondo and Efrain Chocoteco began to drive away. Mosqueda remained in the garage, where officer found his wallet, a cell phone, keys, a lighter, and a .25-caliber bullet. Arredondo had an "A" tattooed on his neck, and Officer Calderon opined that he was an active Arvina gang member. Chocoteco had a "W" tattooed on his cheek and was a member of the Weedpatch 13 gang, a gang that is friendly with the Arvina gang. Officer Calderon opined that Arrendondo and Chocoteco were both active Arvina gang members.

Officer Calderon opined that at the time of the current offense, July 26, 2018, Mosqueda was an active participant in Arvina 13, based on his being brought to the corral and directed, by Ulloa, to assault somebody, his tattoos, his past participation in the Arvina gang, and the presence of Ulloa and Villasenor.

### Gang Evidence Regarding Ulloa

On February 5, 2015, officers responded to a suspected burglary and detained Ulloa, who was 15 years old at the time. Others detained were Guadalupe Cerna, Hermina Cerna, and "Lil Wyno." Ulloa, who had a three-dot tattoo on his finger, was in possession of stolen electronic equipment at the time. Officer Calderon believed Lil Wyno was an active Arvina gang member at the time.

8.

On February 1, 2017, Officer Calderon found Ulloa in possession of a loaded gun and loaded spare magazine. Officer Calderon opined that Ulloa was an active Arvina gang member at the time.

When Ulloa was photographed just prior to trial, he had three dots tattooed on the inside of a finger, a tattoo that means "my crazy life," and can be considered gang-related, although it is also common among people with no gang connection.

Officer Calderon opined that Ulloa was an active Arvina gang member on July 26, 2018, based on Ulloa's history, possession of a firearm, association with two other Arvina gang members, and responding to disrespect by instigating an assault and summoning help.

*Predicate Gang Offenses*

On August 24, 2014, active Arvina gang members Edgar Garcia and Jose Valencia shot at three males who were in a pickup truck at a car wash. A police officer was nearby and a high-speed chase ensued. Garcia was convicted of attempted murder, assault with a firearm, and active participation in a street gang.

On January 30, 2017, Saul Ramirez drove by and shot at the residence of a known Arvina gang dropout. Ramirez was an active Arvina gang member at the time and pled guilty to assault with a firearm and a gang enhancement.

Officer Calderon opined that the charged crimes on July 26, 2018, were committed for the benefit of, at the direction of, and in association with the Arvina gang. The crimes benefitted the Arvina gang by instilling fear in the community, deterring disrespect and discouraging people from reporting crimes.

**DISCUSSION**

I.    *MIRANDA* VIOLATION

Villasenor contends the trial court erroneously admitted statements he made during the investigation of a 2014 assault at Alshaif Market in violation of *Miranda.* As argued by Villasenor, the 2014 incident at the Alshaif Market was "crucial" to the

prosecution's case, as it was the only prior instance of Villasenor spending time with gang members or engaging in behavior that might have been gang-related, and Villasenor's involvement in that incident was erroneously established by his own statements. Villasenor's claim is twofold: first, that his statement made to an officer at school about getting a tattoo the night of the 2014 incident was made in response to law enforcement questioning and should have been excluded; and second, he claims his statements from a subsequent interview at the police department should have been excluded because he had unambiguously invoked his right to counsel. We find no merit to his claim.

*Relevant Background*

Prior to trial, Ulloa filed motions in limine to exclude any reference to or evidence of his or Villasenor's alleged pretrial statements under *Miranda*, specifically defense motions in limine No. 6 and No. 13. Villasenor joined Ulloa's motions in limine.

In addressing motion No. 6, as to the *Miranda* issue, the trial court found the issue moot as to Ulloa, and stated an Evidence Code section 402 hearing would be held as to "the juvenile incident," meaning the 2014 incident involving Villasenor. The trial court also found motion No. 13 moot.

Multiple officers testified pursuant to Evidence Code section 402 for various in limine purposes. The following recites the testimony relevant to the 2014 incident involving Villasenor.

*Evidence Code Section 402 Hearing*

As noted previously, on September 3, 2014, when Villasenor was 17 years old, he engaged in a fight at the Alshaif Market. Officer Calderon testified that he was not present for Villasenor's interview with law enforcement involving the incident. Following Officer Calderon's testimony, the trial court explained that additional foundation testimony would be required before evidence concerning Villasenor's statements involving the September 3, 2014, incident would be admitted.

10.

Sergeant Patricia Stewart testified at the Evidence Code section 402 hearing that, on the morning after the incident, she and Officer Jose Vasquez went to Arvin High School and contacted Villasenor near the dean's office to question him about the previous day's assault. According to Sergeant Stewart, Villasenor was not under arrest at that time, nor was he detained, but she did not tell him he was free to leave if he wished. Villasenor was not told to sit in any particular place or stay in the office where they were. She did not read him his *Miranda* rights.

During their conversation, Sergeant Stewart noticed that Villasenor's hand looked bruised and that he had a tattoo on it, but she did not ask him about it. Villasenor said it was "ink from the tattoo that he had just gotten the evening prior." Sergeant Stewart subsequently asked Villasenor to accompany her to the police department, which he did.

As to the exchange at the high school, the trial court ruled that Villasenor had been subject to a custodial interrogation and was not free to go. However, the trial court ruled that Villasenor's statement about getting a tattoo the night before was admissible because Villasenor was not asked any questions about the tattoo. Instead, the trial court ruled that "it was something [Villasenor] said without being asked."

Officer Vasquez testified that he and Sergeant Stewart interviewed Villasenor at the police station on September 4, 2014. Before questioning Villasenor, Officer Vasquez read Villasenor his *Miranda* warnings verbatim from a department form. When asked, Villasenor indicated that he understood his rights. Before questioning began, Villasenor stated that he wanted his attorney or his mother present, after which questioning stopped. Once Villasenor's mother was present, Villasenor was again asked if he wanted to speak to the officers and he said he would. Villasenor then admitted that he was present at the Alshaif Market on September 3, 2014, to cash a check. A friend had driven him there. Once he had cashed the check, Villasenor stepped outside and "a friend," whom Villasenor would not identify but was later identified as Joe Martinez, started fighting with another man.

11.

Later in the interview, Sergeant Stewart asked Villasenor about his tattoo, and he stated he "woke" up with it on the morning of September 4, 2014. When asked about the meaning of the tattoo, Officer Vasquez reviewed his report and stated that the tattoo was the letter "A" and Villasenor claimed he did not know what it was and that he was not involved in any gang. Villasenor did acknowledge that the letter "A" was normally used by the Arvina gang. When asked, Villasenor admitted that he joined in the fight at the market.

On cross-examination, Villasenor's counsel questioned Officer Vasquez about his police report of the interview. After refreshing his memory, Officer Vasquez acknowledged that, in his report, after being *Mirandized*, Villasenor had said, "I ain't going to answer anything until my attorney is here." Officer Vasquez had then asked, "So you're refusing to talk," and Villasenor had then said, "yeah, unless my mom is here or my attorney I'll speak."

On redirect, Officer Vasquez testified that, once Villasenor's mother was present, he again asked Villasenor if he "still want[ed] to talk about the case." Once Villasenor's mother was present, the interview was audio recorded.

At the Evidence Code section 402 hearing, Sergeant William Funderburk testified that he was provided a cell phone on September 4, 2014, belonging to Villasenor. According to Sergeant Funderburk, Villasenor had been earlier *Mirandized*, although Sergeant Funderburk was not present at the time. Sergeant Funderburk spoke to Villasenor when he was already arrested and booked and asked if he could search his cell phone. Villasenor said he could and signed a consent form. Sergeant Funderburk located text conversations made September 3, 2014, between Villasenor and Juan Martinez in which Villasenor bragged about jumping and stabbing "some fool" at the camel store. In the text messages, Villasenor said he got an "A" tattoo that he "put in [the] work" in for.

Following testimony, the trial court listened to the relevant portions of the recorded interview and found that the interview with Villasenor had been "a

12.

conversational discussion," and while Villasenor was not free to leave, he was not "badgered or threatened." The trial court described Villasenor as first wanting an attorney and then clarifying that he wanted either an attorney or his mother. At this point, the interview was terminated until his mother was located. At that point, the interviewer asked Villasenor if he wanted to proceed because his mother was now present. Villasenor said he would. As summarized by the trial court in finding that Villasenor had waived his *Miranda* rights:

> "It's about an hour and a half gap, but it's clear he was reminded of his rights and he was specifically asked. It wasn't, well, here's your mom, let's get going. He was asked. It was reiterated. You said before you wanted an attorney or your mom. Your mom is here. Do you want to talk now?"

*Trial Evidence*

At trial, Sergeant Stewart testified that, on September 4, 2014, she contacted Villasenor at school, where he told her he had gotten a tattoo on his hand the night before.

Sergeant Stewart and Officer Vasquez subsequently conducted an interview of Villasenor at the police station. Villasenor's mother was present and he waived his *Miranda* rights. During the interview, Villasenor stated that he had gone to the market to cash a check, and saw one of his friends get into a fight with someone with an "LA" tattoo. Villasenor joined in the fight. Villasenor also explained that he got an "A" tattoo on his hand later that night, and he admitted the tattoo represented the Arvina gang, but claimed he was not affiliated with any gang. Villasenor also described the clothing he was wearing at the time, which matched the clothing of one of the perpetrators as shown on a surveillance video.

Cell phone evidence showed that Villasenor bragged to another gang member about committing the crime. Villasenor texted "Lil Wyno" that "we jumped him" during the September 3, 2014, assault. When asked by Juan Martinez in another text "who let you do the A?", referring to Villasenor's new tattoo, Villasenor

13.

replied he "put in work and Posadas did them for me." According to the text, Villasenor "rushed with Jay and Shadow" at the market to "pop the fool from LA." Officer Calderon believed that Villasenor was allowed to get the tattoo as a reward for the assault.

*Standard of Review and Applicable Law*

Generally, when reviewing a *Miranda* dispute " ' "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When part or all of the questioning was recorded, the facts are undisputed and we independently review the trial court's factual determinations. (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

*Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of certain rights, such as the right to remain silent and the right to the presence of an attorney. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085-1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson, supra,* 1 Cal.5th at p. 339.)

Whether a person is in custody hinges on whether a reasonable person would feel free to leave. (*Howes v. Fields* (2012) 565 U.S. 499, 508-509; *Miranda, supra,* 384 U.S. at p. 444.) An interrogation is defined as express questioning or other words and actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from a suspect. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 299-301.)

*Villasenor's Statement Regarding the Tattoo*

Villasenor first claims that his statement to Sergeant Stewart made at the high school that he had gotten a tattoo the night before the 2014 incident was impermissible. Villasenor argues that, even if Sergeant Stewart did not directly ask Villasenor about the

14.

tattoo, her remarks to him noting a bruise on his hand constituted interrogation for *Miranda* purposes as it was likely to elicit an incriminating response. We disagree.

For *Miranda* to apply, the defendant must be subject to interrogation. (*Miranda, supra,* 384 U.S. at p. 479.) As stated above, interrogation under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis, supra,* 446 U.S. at p. 301.) The "reasonably likely to elicit an incriminating response" test focuses primarily upon the perceptions of the suspect. (*Ibid.*) The warning applies only when police conduct an actual interrogation or engage in conduct reasonably likely to induce a response, and voluntary conversation and "small talk" unrelated to the suspected offense are permitted. (*People v. Gamache* (2010) 48 Cal.4th 347, 387-388.)

Here the trial court, in its ruling on the suppression motion, expressly found that Villasenor's statement at the high school about his tattoo was not given in response to any police questioning. While Villasenor claims the court misunderstood Sergeant Stewart's testimony, the trial court rejected this interpretation. "In reviewing the trial court's ruling on a claimed *Miranda* violation, ' "we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained." ' " (*People v. Elizalde* (2015) 61 Cal.4th 523, 530.) Because the trial court's resolution of the disputed facts and inferences is supported by substantial evidence, we accept the trial court's determination, and find no *Miranda* error at this stage. (*People v. Martinez* (2010) 47 Cal.4th 911, 949.)

*Villasenor's Statement at the Police Department*

Villasenor also contends that his longer statement at the police station (which followed the high school conversation) was also inadmissible under *Miranda* because

15.

Officer Vasquez continued to question him after he clearly invoked both his right to counsel and his right to remain silent. We find no prejudicial error.

To reiterate, the rule of *Miranda* requires that before police may question a suspect during a custodial interrogation, the suspect must be advised of the right to remain silent and to an attorney and that any statements may be used against him or her in court. (*Miranda, supra,* 384 U.S. at p. 479.) "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Id.* at pp. 473-474; accord *People v. Davis* (2009) 46 Cal.4th 539, 585; see *Dickerson v. United States* (2000) 530 U.S. 428, 435-443.) When a suspect has exercised his or her option to terminate questioning, officers may not persist "in repeated efforts to wear down [the suspect's] resistance and make him change his mind." (*Michigan v. Mosley* (1975) 423 U.S. 96, 105-106.) "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (*Id.* at p. 104.)

Here, after Officer Vasquez read Villasenor his *Miranda* rights, the following occurred:

> "VASQUEZ: OK, um, Just gonna ask some simple questions. All we want is the honest truth. That's it. That's the best thing you can do right now is just be truthful and honest. OK? Ah, last night, uh, where, where were you?
>
> "VILLASENOR: I ain't gonna answer anything until my attorney is here.
>
> "VASQUEZ: Sir, are you refusing to talk?
>
> "VILLASENOR: Yeah, Unless my mom's here, or my attorney, I don't speak.
>
> "VASQUEZ: Ok, so, uh, you want us to call your mom then?
>
> "VILLASENOR: Whatever you guys like, but she's at work, she's not gonna get here."

Officers stopped the interview, contacted Villasenor's mother and brought her to the police station. About 90 minutes after the first conversation, Officer Vasquez asked Villasenor if he would talk now that his mother was present, and Villasenor said he would. Villasenor's mother spoke only in Spanish and no interpreter was provided.

Questioning then continued and Villasenor admitted that he drove to the Alshaif Market the night before with a friend, intervened in a fight involving the friend, and got the "A" tattoo on his hand at some point in the night. Although Villasenor said that he did not know what the tattoo meant and that he was not involved in any gangs, he did admit that the Arvina gang normally uses a similar "A" borrowed from the Atlanta Braves.

*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 established that, once a suspect unambiguously asserts his *Miranda* rights, the interrogation must cease and further questioning is impermissible until counsel is present. "This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights ...." (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 177, quoting *Michigan v. Harvey* (1990) 494 U.S. 344, 350.) As explained in *Smith v. Illinois* (1984) 469 U.S. 91, "*Edwards* set forth a 'bright-line rule' that all questioning must cease after an accused requests counsel [Citation.] In the absence of such a bright-line prohibition, the authorities through '[badgering] or 'overreaching' – explicit or subtle, deliberate or unintentional – might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (*Smith v. Illinois, supra,* at p. 98.)

Villasenor contends that since he unequivocally invoked his *Miranda* rights by stating he was not going to answer "anything until my attorney is here," Officer Vasquez's subsequent question—"Sir, are you refusing to talk?"—was badgering and not merely "clarification," as ruled by the trial court. Villasenor argues that, since his statement required no clarification, Officer Vasquez's question was improper and was

used to "test [Villasenor's] resolve and induce him to retract or qualify his invocation," which was "successful" but "improper." As noted above, following Officer Vasquez's statement, Villasenor said he would not talk "Unless my mom's here, or my attorney, I don't speak." At that point, questioning stopped, Villasenor's mother was called, and questioning resumed when Villasenor's mother was present and Villasenor said he would talk.

We agree with respondent that, even if Villasenor's statement was sufficiently clear and ambiguous and Officer Vasquez should not have asked any "clarifying" questions, any error in admitting Villasenor's subsequent statements was harmless. (*People v. Bradford* (2008) 169 Cal.App.4th 843, 854; *Chapman v. California* (1967) 386 U.S. 18, 26.) The evidence introduced at trial of Villasenor's statements during his police interview consists of the following: that Villasenor went to the camel market to cash a check, there he saw one of his friends get in a fight with someone outside with an "LA" tattoo, and that Villasenor joined the fight and got an "A" tattoo, commonly representing the Arvina gang, following the fight. However, other "properly" introduced evidence included Villasenor's statement at school and his text messages about participating in the assault and getting a tattoo as a reward. Thus, the offense arising from the September 3, 2014, conduct was proven regardless of Villasenor's statements during the interview at the police department.[9]

In finding the evidence harmless beyond a reasonable doubt, we also reject Villasenor's assertion that the cell phone evidence would have been inadmissible but for the erroneous denial of his *Miranda* motion. Villasenor's text messages were obtained after Villasenor consented to a search of his cell phone. *Miranda* is not violated when an officer asks for and obtains consent to search after the defendant has invoked his *Miranda*

---

[9]     We will address the impact of newly amended law on the section 186.22 enhancements and offense in part III., *post.*

18.

rights. (*People v. Johnson* (2022) 12 Cal.5th 544, 568, fn. 1, citing *People v. James* (1977) 19 Cal.3d 99, 115.) We also note that Villasenor never challenged the admission of the cell phone evidence on *Miranda* grounds below. To the extent that Villasenor is claiming that his consent to search his cell phone was not freely and voluntarily given, that issue was not raised by Villasenor below and has been forfeited on appeal. (*People v. Tully* (2012) 54 Cal.4th 952, 992 [only argument made in trial court was statement taken in violation of defendant's invocation of counsel].)

## II. MOTION FOR MISTRIAL

Villasenor next contends the trial court erred when it denied his mistrial motion after a police officer, in violation of a court ruling, informed the jury that the victim in the 2014 Alshaif Market incident was stabbed multiple times. We disagree.

### *Background*

Prior to Officer Jeffrey Packebush's testimony, the trial court and the parties held a sidebar to discuss the prosecution's desire to ask the officer questions about the injuries he observed to the victim of the September 4, 2014, assault as Alshaif Market. The parties agreed that Officer Packebush could indicate the victim suffered lacerations, but he could not specifically mention "stab wounds," because there was no evidence Villasenor stabbed anyone with a knife. The prosecution informed Officer Packebush of the trial court's ruling.

During Officer Packebush's testimony, the prosecutor asked him what he personally observed about the victim. Officer Packebush answered, "That he was injured. He was holding a blood-soaked paper towel to his forehead." When the prosecutor asked Officer Packebush what injuries he noticed, the officer replied, "They appeared to be multiple laceration stab wounds."

Villasenor's counsel objected. The trial court overruled the objection, but admonished the jury that the testimony should be considered in conjunction with other testimony it would hear later that day or the next, and then clarified, "Any stab wounds or

19.

puncture wounds that is being testified to by this officer were not inflicted by either of these defendants."

Officer Packebush continued his testimony, stating that he observed a vertical laceration on the bridge of the victim's nose, injuries to the victim's arms, his left shoulder, and his back, and observed blood outside the front of the store.

At the next court recess, the trial court addressed the objection that had been made. The trial court acknowledged that Officer Packebush had violated its ruling, but that he did not do so intentionally, and that was why the trial court chose to simply tell the jury that any stabbing or puncture injuries were not inflicted by either Villasenor or Ulloa.

Villasenor's counsel moved for mistrial as the testimony was "highly inflammatory and prejudicial" to Villasenor. Counsel argued that the jury would consider that the victim had been stabbed in a fight Villasenor had been involved in. Ulloa's counsel joined in the motion for mistrial, on grounds that the evidence had violated the trial court's ruling as well as Evidence Code section 352.

The prosecutor stated he specifically told Officer Packebush "to not say the word stab or stab wounds in any way and just to describe the injuries that he saw." The prosecutor also noted that the co-perpetrator of the 2014 incident, Joe Martinez, was convicted of assault with a deadly weapon as a result of that incident, which was being offered as a predicate offense to prove the gang allegation. The prosecutor further argued that the testimony about the stabbing was not unduly inflammatory, and that the trial court cured the prejudicial impact by admonishing that neither Villasenor nor Ulloa engaged in that conduct.

The trial court denied the motion for mistrial, agreeing with the defense that "jurors don't unhear things," but that jurors were presumed to follow the trial court's instructions. The trial court precluded the prosecution from admitting the video of the incident into evidence, although the defense could do so if it wished.

When the jury returned, the trial court again instructed the jury as follows:

20.

"I'm going to read to you an admonition. This means you must consider what I'm telling you. There's another jury instruction that I read at the end of the case that is something like it's up to you to decide what the evidence is. [¶] I'm not the judge of the facts. Do not consider any comments I have made in regard to what I may think about the case. That's absolutely true. I'm not telling you what to think about the case, but I'm telling you this and you must consider this along with all the rest of the other evidence and the jury instructions a[t] the end and the ones I read at the beginning. [¶] In regard to the incident outside the entrance to the Alshaif Market in 2014 that you just heard about, Mr. Daniel Ulloa was not present and had zero involvement. You have heard from another witness later on in this trial that Mr. Ricardo Villasenor was present; however, Mr. Villasenor did not possess any knife or weapon on that date and did not stab anyone."

*Applicable Law and Analysis*

The trial court should grant a mistrial " ' "if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when " ' "a [defendant's] chances of receiving a fair trial have been irreparably damaged." ' " ' [Citation.] " (*People v. Edwards* (2013) 57 Cal.4th 658, 703.)

"A witness's volunteered statement can, under some circumstances, provide the basis for a finding of incurable prejudice." (*People v. Ledesma* (2006) 39 Cal.4th 641, 683.) However, the improper subject matter will rarely be " 'of such a character that its effect ... cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.) Deciding "whether the error can be cured by striking the testimony and admonishing the jury rests in the sound discretion of the trial court." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) Reversal is required only if it is reasonably probable that the volunteered comments could have affected the outcome of the trial. (*Ibid.*)

21.

Villasenor relies on *People v. Turner* (2021) 73 Cal.App.5th 117, to support his argument of prejudice. In that case, two murders were initially joined for trial before the trial court severed the second murder, struck the evidence related to it as inadmissible, instructed the jury not to consider it in its deliberations on the first murder, and denied a motion for mistrial. (*Id.* at pp. 123-124.) Evidence of the second murder had encompassed approximately 15 percent of the testimony at trial, and included extensive and graphic details about the second murder. (*Id.* at pp. 124, 129-130.) The Court of Appeal found an abuse of discretion in denying the mistrial because evidence of the second murder had been extensive; malice was a contested issue at trial; defendant's defense was that he committed only voluntary manslaughter, and evidence of the second murder would have irreparably damaged his credibility; and the jury was not admonished to not to consider it until a week after hearing the evidence. (*Id.* at pp. 129-130.)

Here, only one instance of improper testimony occurred. The trial court immediately admonished the jury to consider the evidence in conjunction with other testimony it would hear later at trial, and then clarified that neither Villasenor nor Ulloa had inflicted the stab wounds Officer Packebush testified to. The trial court repeated this instruction immediately after it denied Villasenor's motion for mistrial.

We must presume that the jury followed those instructions. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) "Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured." (*People v. Martin* (1983) 150 Cal.App.3d 148, 163; see also *People v. Seiterle* (1963) 59 Cal.2d 703, 710 [it is only in "exceptional cases" where "the improper subject matter is of such a character that its effect on the minds of the jurors cannot be removed by the court's admonitions"].) Here, nothing suggests the jury failed to follow the trial court's admonitions and instructions.

22.

Furthermore, it is unlikely Villasenor would have realized a more favorable result had the jury not heard reference to the 2014 incident victim's stab wounds. The fact that the victim in the September 2014 incident had been stabbed was not more inflammatory than the circumstances of the charged offenses. Evidence at trial was that, when Ulloa started a fight with Luis, Villasenor jumped in and repeatedly hit Roberto; Villasenor held a gun in order to keep the victims in the corral until Ulloa returned with Mosqueda; and when Ulloa returned, Villasenor continued to display his gun to keep the Luis and the others from interfering when Luis attacked and then shot Roberto in the leg.

We are also not persuaded by Villasenor's claim of a "high likelihood that the jury would convict [him] not based on the evidence relevant to this case but to punish him for his conduct in 2014." This is especially so since the trial court specifically instructed that Villasenor did not stab the victim in 2014, or even possess any knife or weapon on that occasion. We also note that the verdict in this case demonstrates that Villasenor did not suffer prejudice, as Villasenor was acquitted of the assault with a firearm counts, showing that the jury was not, as Villasenor claims, "irreparably biased against" him and did not convict him solely based on his participation in the 2014 assault.

We conclude the record "demonstrates the absence of any incurable prejudice of the sort that would require the granting of a motion for mistrial." (*People v. Jenkins* (2000) 22 Cal.4th 900, 986.) The trial court could reasonably conclude that the references to the 2014 victim's stab wounds did not irreparably damage Villasenor's chances of receiving a fair trial, and it did not abuse its discretion by denying the mistrial motion.

III.     GANG ALLEGATIONS

Villasenor makes several related contentions concerning the true findings on the gang enhancement allegations and conviction of the gang substantive offense. He contends that the trial court erred when it denied his motion to bifurcate the gang evidence; that the enactment of Assembly Bill No. 333 (Assembly Bill 333), which

23.

amended section 186.22, requires reversal of the gang enhancements and gang substantive offense; and that Assembly Bill 333's newly added section 1109 (Stats. 2021, ch. 699, §§ 3, 5) requires reversal of the entire judgment. The new laws became effective January 1, 2022. (See Cal. Const., art IV, § 8, subd. (c)(1); Gov. Code, § 9600, subd. (a).)

We conclude Villasenor is entitled to reversal of the gang enhancements attached to counts 5, 6, and 7, and substantive conviction for active participation in a criminal street gang, count 8, which the People are entitled to retry under the amended law. We further conclude the failure to bifurcate the gang allegations was harmless as to Villasenor's other convictions.

*Relevant Procedural History*

Before trial Ulloa moved to bifurcate the gang enhancements; Villasenor joined in the motion.[10] Villasenor was charged with assault with a firearm, false imprisonment, active gang participation, and carrying a concealed firearm within a vehicle, along with various firearm and gang enhancements.

The prosecutor moved in limine to admit gang evidence and objected to any bifurcation or severance of gang allegations, stating the "motive, intent, and plan of the criminal activity are so interconnected and intertwined with the gang evidence" that the gang evidence was necessary "for the jury to fully understand the incident." The prosecutor further argued that the gang evidence was admissible under Evidence Code section 352 and that emphasis should be placed on economy of judicial resources.

---

[10] Villasenor's opening brief generally refers to bifurcation, which would technically apply to the gang enhancements and not the active gang participation charge. However, the motion in the trial court requested the court to "sever/bifurcate the gang charges," and we thus presume Villasenor's claim on appeal includes severance of the active gang participation offense as well.

At the hearing on the motion, the prosecution argued that Villasenor and Ulloa had worked together to commit the crimes and secure the presence of Mosqueda, an active Arvina gang member, who assisted at Ulloa's direction. The prosecution acknowledged that no gang slurs were uttered nor gang signs flashed during the crimes, but that Mosqueda did have visible gang-related facial tattoos.

Ulloa's counsel argued that none of the victims knew whether the crimes were gang-related or that Mosqueda's tattoos were gang-related. He further argued that there was no graffiti at the scene to indicate the Arvina gang took credit for the crimes, and there was no indication that anyone's gang status increased based on the crimes.

The prosecutor then referred to the preliminary hearing transcript, which described the purported testimony of a "victim"[11] and that he knew Ulloa's moniker. The prosecutor believed the victims were aware the defendants may be gang members, which affected how the victims reacted to the defendants' actions. The prosecutor argued that the crimes "turn[ed] into being motivated by gang and gang culture, particularly the underlying facts in this case when it comes to respect, losing a fight, maybe losing a bet, then going and getting [a] more senior gang member of Arvina and bringing him into the fight. As argued by the prosecutor, Ulloa "assert[ed] himself to become even more associated with Arvina 13 in order to commit the escalation of these crimes from a simple possible mutual combat to now assault with a deadly weapon, a firearm, false imprisonment, and attempted murder."

Ulloa's counsel argued that the victims had "no idea who [Ulloa] was" at the time of the crimes. Villasenor's counsel argued that the statement from the preliminary hearing only references Ulloa's moniker and said nothing about Ulloa being a gang member.

---

**11**      See part VII. of the Discussion, *post*, on the prosecutor's use of the term "victim" in this context.

The trial court reviewed the preliminary hearing testimony and, citing applicable law, determined the gang evidence was relevant and admissible. In denying the motion, the trial court stated the following:

> "Based on the People's theory and the information that I know, at this point, I am not going to bifurcate. [¶] … [¶] … I will say, after the gang expert for the People testifies this afternoon, I will think more. If there's something that changes, I will tell everybody, but, at this point, I do not believe it is appropriate to bifurcate with the appropriate instruction given to the jury as to how this information can be considered."

Later, during the hearing Ulloa's counsel renewed his request for bifurcation and severance, citing *People v. Albarran* (2007) 149 Cal.App.4th 214, which held that "certain extremely prejudicial gang evidence was not relevant to the underlying charges; the People failed to present sufficient evidence these crimes were gang motivated." (*Id.* at p. 217.)

The trial court explained that "some of the evidence" at the preliminary hearing and police reported relied on by Officer Calderon had to do with identity, motive, and intent, "which is why they're intrinsically linked, which is why I'm not bifurcating." The trial court noted that, while one of the victims at the preliminary hearing did not mention believing Villasenor, Ulloa or Mosqueda were gang members, the victim "then said something like that in a report that was taken."

## Assembly Bill 333

While Villasenor's appeal was pending, the Legislature enacted Assembly Bill 333, which, in part, amends section 186.22 to impose new substantive and procedural requirements for proving gang allegations. The legislation went into effect on January 1, 2022.

Section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions found in subdivision (b), both at issue here. (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.)

26.

At the time of the underlying events, a criminal street gang was defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f), as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

A "pattern of criminal gang activity" was previously defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [offenses listed in paragraphs (1) to (33)], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons ...." (Former § 186.22, subd. (e), 1st ¶, as amended by Stats. 2016, ch. 887, § 1; see Stats. 2013, ch. 508, § 1.)

Assembly Bill 333 amended section 186.22 in several ways:

"First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill

333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' " (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

Finally, Assembly Bill 333 also added section 1109, which requires gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires that the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)), be tried separately from all other counts that do not require gang evidence as an element of the crime. (§ 1109, subd. (b).)

*Villasenor is Entitled to Reversal of His Substantive Gang Conviction and Gang Enhancements*

Assembly Bill 333's amendments to section 186.22 apply retroactively to cases not yet final as of the legislation's effective date. (*People v. Tran, supra,* 13 Cal.5th at pp. 1206-1207.) Thus, as to Villasenor's contention that Assembly Bill 333's recent changes to section 186.22 require reversal of the gang substantive offense and gang enhancements, Villasenor claims the evidence at trial failed to support Assembly Bill 333's new requirements in three ways: it fails to show that (1) the Arvina gang was an "organized" association or group; (2) that gang members "collectively" engage in or have engaged in patterns of criminal activity; and (3) that the predicate offenses were committed within the required time frame. The People disagree on the first and second points, but concede evidence on the third point is lacking. We accept the People's concession and reverse the gang enhancements allegations attached to count 5, 6, and 7, and the gang conviction in count 8.[12] "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75

---

[12] Because we reverse the substantive gang offense in count 8, the firearm enhancement (§ 12022.5, subd. (a)), attached to that count is also reversed.

Cal.App.5th 467, 480; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822-823 & fn. 19.)

<u>*The Failure to Bifurcate was Harmless*</u>

As for Villasenor's contention that the trial court erred when it denied his motion to bifurcate and that Assembly Bill 333 requires reversal of the entire judgment because the new section 1109, concerning bifurcation and severance, applies retroactively to his case, the People disagree, arguing that section 1109 does not apply retroactively and, even if it does, Villasenor was not prejudiced by the denial of his motion to bifurcate. We address those issues below and find no prejudicial error occurred.

The courts of appeal are split on whether section 1109 applies retroactively. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 565-568 [holding § 1109 applies retroactively under *Estrada*], review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128-1131 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [holding § 1109 is not retroactive], review granted Aug. 17, 2022, S275341, *People v. Boukes* (2022) 83 Cal.App.5th 937, 947-948 [same], review granted Dec. 14, 2022, S277103, and *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [same], review granted Aug. 17, 2022, S275090.) Furthermore, in *People v. Tran, supra,* 13 Cal.5th at page 1208, the California Supreme Court declined to resolve the split, concluding any failure to bifurcate the gang allegations was harmless. ,

In reviewing for prejudice in *Tran*, the California Supreme Court concluded the failure to bifurcate in that case did not render the trial fundamentally unfair such that it required review under the standard for federal constitutional error articulated in *Chapman v. California, supra,* 386 U.S. 18. (*People v. Tran, supra,* 13 Cal.5th at p. 1209.) Accordingly, the court considered whether the defendant was prejudiced under the state law standard of review articulated in *People v. Watson* (1956) 46 Cal.2d 818 and concluded the defendant had failed to establish prejudice as to his guilty verdicts. (*Tran*,

29.

at p. 1209.)  In so holding, the *Tran* court rejected the contention the failure to bifurcate as required under section 1109 constitutes structural error.  (*Tran*, at p. 1208.)

Here, as in *Tran*, it is unnecessary to address the parties claims regarding retroactivity because we conclude the failure to bifurcate the proceedings was harmless. In so holding, and for the reasons discussed further, *post*, we cannot conclude the admission of the gang evidence rendered the trial "fundamentally unfair" such that it resulted in a due process violation requiring us to review for prejudice under the *Chapman* standard for constitutional error.  (See *People v. Tran, supra,* 13 Cal.5th at p. 1209.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)  "The Supreme Court has emphasized 'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.)

Applying the *Watson* standard for state law error, we cannot conclude it is reasonably probable Villasenor would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancements and substantive gang offense been bifurcated.  (See *People v. Watson, supra,* 46 Cal.2d at p. 836.)  As in *Tran*, "[t]he case for guilt here was strong." (*People v. Tran, supra,* 13 Cal.5th at pp. 1209-1210.)

Two of the victims, Luis and Roberto, identified Villasenor and Ulloa at trial as involved in the incident.[13] Both testified that Villasenor stood by the door of the corral, gun in hand, and told them that they had to stay until Ulloa returned so he could fight them. Photographs at trial showed physical evidence of Ulloa present at the scene prior to the incident and Roberto's wound to his leg as a result of being shot. When Villasenor was arrested at a gas station later that day, he had in his possession a black baseball cap with "Arvin" on it, two cell phones, a live .40-caliber bullet, and a loaded .40-caliber pistol.

Nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges. "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Gang evidence, " 'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Ibid.*, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Additionally, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and .... An explanation of the basis for the witness's fear is likewise relevant to her credibility ...." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

"But, 'even where gang membership is relevant, because it may have a highly inflammatory impact on the jury[,] trial courts should carefully scrutinize such evidence before admitting it.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 294.) "Such evidence should not be admitted if only tangentially relevant" (*People v. Gurule* (2002) 28 Cal.4th

---

**13** The record indicates that Roberto's brother Juan, the third victim, was in Mexico and unavailable as a witness at trial.

557, 653), or "where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; accord, *People v. Cardenas* (1982) 31 Cal.3d 897, 904-905). "Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

Here, at least some gang evidence would have been admissible to prove the underlying charges even if the gang allegations had been bifurcated and severed. Luis referred to his attackers as gang members when he spoke to law enforcement. Mosqueda had definite visible gang tattoos on his face. As testified to by the gang expert, the more visible the gang tattoos, the more fear is instilled in the community by their actions. At trial, Luis testified that he was nervous and felt "panic" in looking at the two defendants, and he had "anxiety attacks because of what happened" and did "not live the same way anymore."

Thus, even if section 1109 required bifurcation of the gang enhancements and substantive gang offense allegations, it is likely some, though not all, of the gang evidence would have come in at a trial on the other substantive offenses. (See *People v. Hernandez, supra,* 33 Cal.4th at pp. 1049-1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative"].)

We further note the jury was given a limiting instruction regarding its consideration of the gang evidence, both before closing arguments and after, which we presume it followed. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions [regarding considering gang evidence for limited purpose], and there is nothing in this record to rebut that presumption"].) Consequently, on this record, we cannot conclude Villasenor was prejudiced by the failure to bifurcate the substantive gang offense and gang enhancement allegations from the other charges. (See *People v. Hernandez, supra,* 33 Cal.4th at p. 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt"].) Thus, Villasenor is not entitled to reversal and retrial of his remaining convictions on this basis.

Finally, we note that the jury's verdict, which acquitted Villasenor of all assault with a firearm charges, demonstrates that it was not improperly affected by the admission of the gang evidence. Instead, the verdict demonstrates that the jury considered each piece of evidence separately, and it was not swayed by any prejudice that might have flowed from the gang evidence. (*People v. Ramos, supra,* 77 Cal.App.5th at pp. 1131-1132; *People v. Williams,* (2009) 170 Cal.App.4th 587, 613.)

In sum, we find that it is not reasonably probable Villasenor would have received a more favorable result if the gang allegations had been severed and bifurcated, and therefore any error was harmless. (*People v. Watson, supra,* 46 Cal.2d at p. 836.) And because we find no prejudicial error in the trial court's failure to bifurcate the gang allegation pursuant to newly added section 1109, we need not address Villasenor's claim that the trial court erred in denying his motion to sever or bifurcate those allegations at trial as the law stood at the time, pre section 1109. (*People v. Bean* (1988) 46 Cal.3d 919, 940.)

33.

## IV. VICTIMS PRECLUDED FROM CROSS-EXAMINATION ABOUT IMMIGRATION STATUS

Villasenor next contends the trial court improperly precluded cross-examining the victims about their awareness of possible immigration relief, ostensibly through the U visa program which generally provides temporary immigration benefits to victims of specified crimes if a law enforcement agency certifies the victim was helpful in the prosecution of the crime. (8. U.S.C. § 1101 et seq.; see *Lee v. Holder* (9th Cir. 2010) 599 F.3d 973, 974 [discussing general qualifications for and benefits of U visas].) We find no abuse of discretion in excluding the issue from cross-examination. Even if the exclusion was error, it was harmless under the circumstances of this case.

*Background*

On cross-examination of Luis, Ulloa's counsel asked Luis if he was in the United States on a work visa. The prosecutor objected on grounds of relevance, which was sustained. Ulloa's counsel stated the evidence was relevant to bias and credibility, and a sidebar held.

Outside the jury's presence, Ulloa's counsel argued that Luis might have been involved in cockfighting, a felony that would potentially impact his ability to remain in the United States, if he were here illegally, and that his involvement could have led him to be deceptive about the case. Villasenor's counsel added that she had received information that Roberto had applied for either legal residency or some form of "victim of a crime" residency as a result of his involvement in the case, and she requested the prosecutor investigate further.

The trial court explained that, at the time the question was posed, it had not believed there was a basis to ask it, "particularly in light of current law." But it did permit an investigating officer to ask Luis, off the record, if he was a United States citizen or on a work visa. Luis declined to answer any of the officer's questions. As a result, the trial court tentatively ruled there would be no questions asked of Luis "as to his

34.

status in this country, whether he's a citizen, whether he's on a work Visa, whether it's something different." However, the trial court did allow the parties to brief the issue.

The following week, the trial court revisited the issue and ruled that the fact that someone may not be a legal resident, on its own, was not admissible under Evidence Code sections 351.4 and 352. But, it held that, if there was some benefit provided to the witness by the government, discovery of that benefit would be provided to the defense and the trial court would reconsider its ruling.

The following day, the prosecutor sent an e-mail to the court and parties stating that Roberto was aware of the possibility that a "status benefit" might arise based on his being a victim, but he claimed he had not formally inquired about it or followed through with anything. According to the prosecutor, the police department denied Roberto's request for a copy of the police report in the case, but it had not received any immigration status requests from him. The prosecutor believed Luis was aware at that time of the visa procedure, as likely brought to his attention by the victim advocate, but he had not filed an application for it.

The trial court then held an in-camera hearing with Luis, who denied being offered any money or a visa by any government agency in connection with this case. He also denied having applied for a visa or for residency in the United States as a victim of a crime.

The trial court also held an in-camera hearing with Roberto, who denied being offered any money or compensation by the government for testifying in this case. He also denied looking into or applying for a visa or residency as a result of his involvement in this case. Roberto testified that he had "just found out" that applying for a visa or residency as a result of his status as a victim in this case was an option for him, but he had not applied for it.

The trial court then ruled that it was prohibiting any questions about the issue.

*No Abuse of Discretion on the Part of the Trial Court*

A trial court's order is presumed correct and the appellant has the burden to demonstrate the court committed reversible error. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694.) Relevant evidence is admissible evidence (Evid. Code, §§ 350, 351), and can include "evidence relevant to the credibility of a witness." (Evid. Code, § 210.) "As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544.) Indeed, statutory authority provides that impeachment evidence regarding a witness's motivation to lie can be deemed relevant to prove a disputed material fact. (See Evid. Code, §§ 210, 780, subd. (f).)

However, although " '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*People v. Brown, supra,* 31 Cal.4th at p. 545.) It is well established that a trial court has substantial discretion to exclude collateral evidence used to attack witness credibility (*People v. Thornton* (2007) 41 Cal.4th 391, 428-429), and "a trial court's [evidentiary] ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

We find the circumstances shown by the record do not support an argument that the trial court abused its discretion in making its ruling. We acknowledge that a witness's desire to obtain a visa could color his testimony and, under some circumstances, be compelling evidence of bias. Here, however, the evidence to support an inference of bias or motive was weak.

There was no evidence that either Luis or Roberto applied, or intended to apply, for a U visa, nor is there any evidence either was aware of the U visa program at the time they met with the investigating officer, or that their testimony at trial was materially inconsistent with their initial statements to police or their preliminary hearing testimony. The issue of whether Luis and Roberto were aware of or intended to apply for a U visa was therefore a collateral one and had no direct relationship with the facts surrounding the alleged crimes. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) The relationship between Luis and Roberto's credibility as a witness and a potential motivation to testify untruthfully based upon benefits theoretically available through a U visa was too tenuous to make the issue relevant for cross-examination at trial.

Villasenor cites to three out-of-state cases to argue error occurred. We find the cases unpersuasive because their circumstances bare little similarity to the material circumstances of this case. First and foremost, all of the cases cited to by Villasenor involved circumstances in which the alleged victim had already applied for a U visa by the time of the defendant's trial. (*Romero-Perez v. Commonwealth* (Ky.Ct.App. 2016) 492 S.W.3d 902, 904 (*Romero-Perez*) [At trial, during prosecution's case-in-chief, defendant sought to cross-examine alleged domestic violence victim about the fact that she had applied for a U visa]; *State v. Del Real-Galvez* (Or.Ct.App. 2015) 270 Or.App. 224, 226 (*Del Real-Galvez*) ["As defendant's case proceeded to trial, [sexual abuse victim's] mother applied for a U visa to remain in the United States and based her application on [victim's] allegations that defendant had sexually abused and coerced [victim]"; *State v. Valle* (Or.Ct.App. 2013) 255 Or.App. 805, 807 (*Valle*) ["During the trial in this case, defendant sought to cross-examine [alleged sexual abuse victim] about the fact that she had applied for the U visa"].) Indeed, in *Romero–Perez*, the fact that the victim's U visa application was pending before the trial court at the time of trial was cited by the appellate court as the primary basis for finding error in the trial court's exclusion

37.

of cross-examination regarding the U visa. (*Romero-Perez, supra,* 492 S.W. at p. 903.) In contrast here, neither Luis nor Roberto had applied for a U visa.

In sum, the cases cited by Villasenor do not persuade us that the trial court committed error when it ruled to prohibit cross-examination about Luis or Roberto's possible intention to apply for a U visa or some sort of immigration relief.

*Evidence Code Section 352*

A balancing of the probative value of the cross-examination at issue against its potential prejudice, pursuant to Evidence Code section 352, also supports our conclusion to affirm the trial court's ruling. Evidence Code section 352 authorizes a court to exercise its discretion to exclude evidence if the evidence's probative value is substantially outweighed by its prejudicial impact.

In *People v. Villa* (2020) 55 Cal.App.5th 1042 (*Villa*), the Fourth District affirmed a trial court's decision to exclude evidence that a victim had an outstanding application for a U visa at the time of trial. (*Id.* at pp. 1047-1048.) At an Evidence Code section 402 hearing, the victim stated that she learned about the U visa program after she testified at the preliminary hearing. (*Villa*, at p. 1048.) She completed the U visa application and "understood she would have to cooperate with the prosecution of the case, testify if she was subpoenaed, and testify truthfully." (*Ibid.*) The trial court excluded the evidence under Evidence Code section 352, finding that its probative value was "far outweighed by 'the tendency of that particular item to open up a massive inquiry requiring an undue consumption of court time and tending to confuse issues and invite jury speculation.' " (*Villa*, at p. 1048.) Recognizing that the victim's application for a U visa was relevant impeachment evidence, the trial court observed that the victim's trial testimony was similar in all material respects to her preliminary hearing testimony during which she was unaware of the U visa process. (*Id.* at p. 1052.) The trial court then balanced the limited probative value of the evidence against the " 'huge chunk of time' " necessary to evaluate the victim's motivation, such as whether she changed her story after the preliminary

hearing when she learned of the U visa program, her beliefs about what the prosecution expected from her, and the status of her application. (*Id.* at p. 1053.) The trial court affirmed the exclusion of the evidence, explaining that, among other reasons, the evidence could prejudice the jury against the undocumented victim. (*Ibid.*)

Villasenor attempts to distinguish *Villa* from his own case, noting that the trial court in *Villa* conducted an analysis on the record pursuant to Evidence Code section 352, which was not done here. However, even if a trial court does not conduct such an analysis, the section provides grounds to affirm the correctness of the trial court's ruling on appeal. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

Accordingly, we find the marginal probative value of cross-examining Luis and Roberto about any possible intention to apply for a U visa was substantially outweighed by the probability that the issue would have created a substantial danger of undue prejudice at trial. (Evid. Code, § 352.) First, the collateral nature of the issue, by itself, minimized its probative value and emphasized the possibility of it prejudicing or confusing the jury. (See *People v. Lavergne* (1971) 4 Cal.3d 735, 742.) It is also clear the proffered cross-examination issue presented a significant potential for prejudice because it would have involved discussing Luis and Roberto's right to be present in this country. (*Romero-Perez, supra,* 492 S.W.3d at p. 906 ["In short, the U visa creates a pathway whereby an illegal immigrant may be able to obtain lawful permanent residency within three years"]; cf. Evid. Code, § 351.4 ["[E]vidence of a person's immigration status shall not be disclosed in open court" prior to an in camera hearing conducted to determine the admissibility of the evidence].) Indeed, our Legislature, enacting Evidence Code section 351.4 (Stats. 2018, ch. 12, § 2), recognized that the issue of illegal immigration is a sensitive one in this state. (*Id.* § 3, reprinted at Historical and Statutory Notes, 29B pt. 1A, West's Ann. Evid. Code (2019 supp.) foll. Evid. Code, § 351.4, p. 53 ["In order to immediately help protect undocumented residents of California and their ability to participate in the California justice system, it is necessary that this act take

effect immediately"].) Accordingly, we find no abuse of discretion on the trial court's part in ruling to exclude the evidence, because the probable prejudicial effect of the proposed cross-examination issue substantially outweighed its probative value pursuant to Evidence Code section 352.

## V. ENACTMENTS TO SECTION 1170 REQUIRE REMAND

Villasenor next claims that his case must be remanded to the trial court for resentencing under amended section 1170, subdivision (b)(6). The People concede the issue, and we remand for resentencing.

### *Background*

As applicable here, Villasenor was sentenced to state prison for an aggregate determinate term of 12 years, which included the middle term of two years on count 5, the middle term of four years on the corresponding firearm enhancement, and the middle term of three years on the corresponding gang enhancement. Villasenor was also sentenced to the middle term of two years on count 7, the middle term of four years on the corresponding firearm enhancement, and the middle term of three years on the corresponding gang enhancement, to be served concurrent with count 5. Villasenor was 21 years old at the time he committed the offenses.

### *Applicable Law and Analysis*

Effective January 1, 2022, our determinate sentencing law, section 1170, was amended in several fundamental ways. (See Sen. Bill No. 567 (2020–2021 Reg. Sess.); Stats. 2021, ch. 731, § 1.3; Assem. Bill No. 124 (2020–2021 Reg. Sess.); Stats. 2021, ch. 695, § 5.) Relevant here, Senate Bill No. 567 amended section 1170, former subdivision (b) by making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).) This bill also created a presumption in favor of a low prison term when a defendant is under 26 years of age at the time of the offense. (Stats. 2021, ch. 695, § 4, adding § 1016.7; Stats. 2021, ch. 695, § 5.1, adding § 1170, subd. (b)(6)(B).)

Section 1170, subdivision (b)(6) provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] ... [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (§ 1170, subd. (b)(6); see § 1016.7, subd. (b) ["A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed"].)

Section 1170, subdivision (b)(6)(B) does not require imposition of the lower term in every case in which the defendant was under age 26 at the time the crime was committed. Rather, this provision establishes a presumption of the lower term if the defendant's youth was "a contributing factor" in his or her commission of the crime "*unless* the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6).)

The People correctly concede the amended version of section 1170, subdivision (b) that became effective on January 1, 2022, applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.) Under established law, we "assume, absent evidence to the contrary, that the Legislature intended an 'amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.' " (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) "For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of certiorari in the United States Supreme Court." (*Id.* at pp. 341-342, citing *People v. Vieira* (2005) 35 Cal.4th 264, 305-306.)

Villasenor was 21 years old at the time he committed the offenses in July of 2018. Because the trial court imposed the middle terms for Villasenor's sentences on counts 5 and 7, as well as the corresponding firearm enhancements[14], we agree with the parties that under section 1170, subdivision (b), Villasenor's sentence must be vacated and remanded to the trial court to decide under the newly amended law whether he is entitled to the lower term on count 5 and 7.

## VI.    SECTION 654

Villasenor contends that the matter must also be remanded to permit the trial court to exercise new sentencing discretion provided by Assembly Bill No. 518 (2021-2022 Reg. Sess), which amended section 654 and passed while this appeal was pending. (Stats. 2021, ch. 441, § 1.) The People agree the new law applies here, but contend that, since this case is being remanded already, we need not address the issue further and Villasenor can raise the claim at the time of resentencing. We agree with the parties that Assembly Bill No. 518 applies retroactively to Villasenor's nonfinal sentence and remand the matter.

*Applicable Law and Analysis*

Effective January 1, 2022, "Assembly Bill 518 amended Penal Code section 654, subdivision (a) to provide, in pertinent part: 'An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision.' (Italics added.) Previously, where Penal Code section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. (Pen. Code, § 654, former subd. (a).) As amended by Assembly Bill 518, Penal Code section 654 now

---

**14**    As addressed in part III., *ante,* the gang enhancements attached to counts 5 and 7 are reversed.

42.

provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Assembly Bill No. 518 applies retroactively to Villasenor's nonfinal sentence. (See *People v. Mani, supra,* 74 Cal.App.5th at p. 379.)

Defendants " 'are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

At Villasenor's 2021 sentencing, the trial court followed the then relevant statutory dictate by staying the *shorter* sentence on the section 186.22, subdivision (a) offense and corresponding firearm enhancement in lieu of the greater punishment for the false imprisonment convictions. Although the trial court gave no reason for selecting the longer term, it did state at sentencing that it had reviewed and considered the probation officer's report which recommended the sentence on count 8 be stayed pursuant to section 654 as it "arise[s] from the same set of operative facts as other counts with a greater punishment being recommended." Thus, the trial court was "unaware of the scope of its discretionary powers" and the appropriate remedy is to remand for resentencing. (*People v. Gutierrez, supra,* 58 Cal.4th at p. 1391.) We express no opinion on how the trial court should exercise its discretion.

We note, however, that here, as discussed in part III., *ante,* we reverse the section 186.22, subdivision (a) substantive offense due to the changes in Assembly Bill 333 and

remand to allow the prosecution to retry the offense if they so choose. Taking the section 186.22, subdivision (a) out of the sentencing equation essentially moots the issue as now framed by Villasenor. However, on remand, Villasenor is able to raise his sentencing claims at resentencing, as the trial court may revisit all of its prior sentencing decision under section 654, as amended. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["[T]he full resentencing rule allows a trial court to revisit all prior sentencing decisions when resentencing a defendant"]; see also *People v. Jones* (2022) 79 Cal.App.5th 37, 46 [where a defendant's sentence is potentially affected by recent amendments to sections 654 and 1170, subdivision (b), remand for a full resentencing is appropriate].)

## VII. PROSECUTORIAL MISCONDUCT/INEFFECTIVE ASSISTANCE OF COUNSEL

Villasenor joins Ulloa's argument that the prosecutor engaged in deception, which caused the trial court to improperly deny the motion to sever and bifurcate the gang allegations. Villasenor also contends that, if we find the issue of prosecutorial misconduct has been waived, defense counsel was ineffective for failing to object to the prosecutor's alleged misstatement.

*Background*

At the preliminary hearing, Cisneros, the owner of the corrals where the incident took place, testified that he first noticed "something unusual" on the evening of July 26, 2018, when he saw a truck belonging to Villasenor leave the corral. The truck was being driven by Ulloa, whom Cisneros knew as "little Casper," because that was what "[e]verybody in Arvin" called him. Cisneros had known Ulloa since he was a child.

Prior to trial, as addressed in part III., *ante*, Ulloa filed a written motion, joined by Villasenor, asking that the gang allegations and evidence be severed or bifurcated. At the hearing on the motion to bifurcate, the prosecutor explained that, while she was not aware of anything said or any gang signs displayed at the time of the incident about Arvina 13, Mosqueda had visible gang-related tattoos "plastered on his face and his head", which

would have been apparent to the victims. Ulloa's counsel countered that neither Ulloa nor Villasenor had any visible tattoos, none of the victims knew Mosqueda's tattoos to be gang-related, none of them had any idea whether the crime was committed by gang members, and there was no other evidence to indicate to the victims that the perpetrators were gang members. Villasenor's counsel joined in these comments.

The prosecutor then cited page 215 of the preliminary hearing transcript and referred to testimony "of a victim" who knew Ulloa was known as "Lil Casper," his gang moniker. The prosecutor reasoned that "these victims know who these individuals are, they know what their monikers are" and, because the victims were aware the perpetrators were gang members, bifurcation was not appropriate. The prosecutor argued against bifurcation, reasoning that, "Based on the fact that at least one victim knows of Mr. Ulloa's moniker does show that they are aware that these people may be gang members and goes to the fear and whether or not they fight back or not."

Ulloa's counsel repeated that the evidence showed the victims "said they had no idea who [Ulloa] was." Villasenor's counsel also noted that the page in the preliminary hearing transcript cited by the prosecutor did not reference Ulloa being a gang member or demonstrate any knowledge that he was a gang member, only that Ulloa had a moniker.

The trial court reviewed and recited the relevant pages of the preliminary hearing transcript and then discussed relevant case law and legal concepts applicable to a bifurcation motion. In denying the motion to bifurcate, the trial court found that gang evidence, generally speaking, was relevant, admissible, and, "at this point," was not more prejudicial than probative.

*Applicable Law and Analysis*

Villasenor alleges the prosecutor's labeling of Cisneros as a "victim" and his knowledge of Ulloa's gang moniker as evidence that the victims knew the perpetrators were gang members was intentionally deceptive. The People argue Villasenor failed to object to the prosecutor's designation of Cisneros as a victim and thereby forfeited the

claim. To the extent this claim is forfeited, Villasenor claims he received ineffective assistance of counsel, which we will address.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*Mendoza, supra*, at p. 700.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Tully, supra,* 54 Cal.4th at p. 1010.)

As a threshold matter, Villasenor acknowledges that a defendant may not complain on appeal of prosecutorial misconduct unless he objected on the same ground and timely requested an adequate remedy. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) However, he argues that, to the extent his claim regarding prosecutorial misconduct is forfeited, his counsel provided ineffective assistance in failing to object. " 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674; see *People v. Lopez* (2008) 42 Cal.4th 960, 966.)

A criminal defendant has a Sixth Amendment right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To prove ineffective assistance of counsel, a defendant must satisfy *Strickland's* two-part test requiring a showing of counsel's deficient performance and prejudice. (*Ibid.*) A defendant bears the

burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice. (*Id.* at pp. 688, 694; *People v. Centeno, supra,* 60 Cal.4th at p. 674; *People v. Ledesma, supra,* 39 Cal.4th 641, 746.)

As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland v. Washington, supra,* 466 U.S. at p. 688.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' " (*People v. Ledesma, supra,* 39 Cal.4th at p. 746.) A "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772; see *People v. Centeno, supra,* 60 Cal.4th at pp. 674-675.)

The prejudice prong requires a defendant to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington, supra,* 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) Prejudice must be affirmatively proved. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Where a defendant fails to show prejudice, a reviewing court may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (See *Strickland*, at p. 697.)

Here, the record reflects that Villasenor's counsel was aware of the prosecutor's inaccurate description of the evidence, but instead of formally objecting, relied on Ulloa's counsel's argument, which addressed the inaccuracy of the prosecutor's comment and highlighted the evidence that the victims "had no idea who [Ulloa] was." Villasenor's counsel then further noted to the court that the statement referenced by the prosecutor did not establish Ulloa was a gang member, only that he was referred to by his moniker.

Furthermore, the remarks were not made to the jury but to the trial court, which was aware and specifically reviewed the preliminary hearing testimony. Villasenor's counsel could have reasonably determined that the trial court was not misled by the prosecutor's statement – perhaps the trial court was not so focused on Cisneros as being a "victim," (as the preliminary hearing transcript was clear that Cisneros was not present at the time of the shooting), but rather on Cisneros's comment that "[e]verybody in Arvin" called Ulloa by his moniker, meaning his gang membership was well known.

Even if Villasenor's counsel should have formally objected, we find Villasenor was not prejudiced by this failure. Villasenor incorrectly focuses his prejudice analysis on whether it is reasonably probable he would have received a different verdict at trial. But the appropriate analysis is whether it is reasonably probable he would have received a more favorable outcome on the trial court's bifurcation ruling.

To the extent Villasenor reiterates arguments that were made to support his bifurcation claim, we have addressed that issue in part III., *ante,* and affirm our decision.

We therefore reject Villasenor's claim of ineffective assistance of counsel.

VIII.   SUFFICIENCY OF THE EVIDENCE ON GANG ENHANCEMENTS

Villasenor, joining Ulloa's argument, contends there was insufficient evidence to support the gang-related enhancements. Specifically, he argues that, under the law as it existed at the time of the trial, there was "insufficient evidence he committed any crime for the benefit of, at the direction of, or in association with a criminal street gang, and/or

48.

with the specific intent to promote, further, or assist in criminal conduct by gang members." We disagree.[15]

"The standard of appellate review for determining the sufficiency of the evidence supporting an enhancement is the same as that applied to a conviction." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 483 (*Weddington*).)

We address this issue in accordance with the law applicable at the time of trial. To establish the gang enhancement under section 186.22, subdivision (b), the prosecution must establish "that the underlying felonies (1) were committed for the benefit of, at the direction of, or in association with any criminal street gang and (2) were committed with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 572.)

"Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member." (*Weddington, supra,* 246 Cal.App.4th at p. 484.)

The second prong applies to any criminal conduct and can include the conduct underlying the charged offense. (*People v. Albillar* (2010) 51 Cal.4th 47, 66 (*Albillar*) [" 'There is no statutory requirement that this "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing' "]; see also *People v. Vasquez* (2009) 178 Cal.App.4th 347, 354.) Because intent is rarely susceptible of

---

**15** Although we agree with the People's concession that the ameliorative changes wrought by Assembly Bill 333 require we reverse the true findings on the gang enhancements (see, part III., *ante*), and allow the prosecution to retry Villasenor under the Assembly Bill 333's new requirements, we address Villasenor's contention here because a successful challenge on sufficiency of the evidence would bar retrial (*People v. Sek* (2022) 74 Cal.App.5th 657, 669-670 [noting that double jeopardy clause would bar retrial if evidence is deemed insufficient under statute as it read at the time of trial, but not where prosecution failed to prove elements under statute amended after trial].)

direct proof, it must be inferred from the surrounding facts and circumstances. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 72.) "For this reason, 'we routinely draw inferences about intent from the predictable results of action.' " (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411.)

Proof of association with a gang may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were on a frolic and detour unrelated to the gang. (*Weddington, supra,* 246 Cal.App.4th at p. 484.) In the instant matter, the prosecution presented substantial evidence that Villasenor, Ulloa, and Mosqueda were all members of the Arvina gang. Both Villasenor and Mosqueda had gang tattoos; Mosqueda had multiple gang tattoos on his head, and the incident took place in gang territory. In fact, Mosqueda was summoned to "help" assault the victims. (*Albillar, supra,* 51 Cal.4th at p. 62 [evidence that defendants came together as gang members to commit crimes constituted substantial evidence the crimes were committed in association with a gang].) Under these circumstances, Villasenor, Ulloa and Mosqueda "not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes." (*Id.* at pp. 61-62.) Accordingly, there was more than sufficient evidence to satisfy the "in association" requirement of the first statutory prong. (*Id.* at p. 62; see also *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["the jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

The California Supreme Court further concluded in *Albillar, supra,* 51 Cal.4th 47, that, "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.) Accordingly, the evidence outlined above also satisfies

the jury's finding that the second prong of section 186.22, subdivision (b)(1) was satisfied. (*Ibid.*; see also *People v. Miranda, supra,* 192 Cal.App.4th at p. 412 [substantial evidence supported finding of specific intent to benefit gang where defendant gang member committed crimes with two other members or associates of the gang in gang territory]; cf. *People v. Franklin, supra,* 248 Cal.App.4th 938, 949 [noting "scienter requirement may be satisfied with proof 'that the defendant intended to and did commit the charged felony with known members of a gang,' " but concluding intent requirement not met where defendant committed crimes with members of a different gang].)

We thus conclude sufficient evidence supported the gang-related enhancement under section 186.22, subdivision (b) under the law as it existed at the time of trial.

IX.     CUMULATIVE ERROR

Villasenor finally contends cumulative error resulted from the combined effect of the individual errors alleged in his opening and reply briefs, as well as those adopted from Ulloa's briefs. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have already concluded Villasenor's substantive gang offense and gang enhancement allegations must be reversed and remanded for retrial if the prosecutor chooses to do so. We also remand for resentencing. In all other respects, we have either rejected Villasenor's claims of error and/or found any errors, presumed or not, were not prejudicial. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.) We therefore find no cumulative error.

**DISPOSITION**

51.

We reverse the gang enhancements attached to count 5, 6, and 7, and the count 8 gang substantive offense (along with the section 12022.5 firearm enhancement attached to that count) and remand to allow the People the option of retrying the gang enhancements and gang substantive offense under the amended law.  We also remand for resentencing in accordance with sections 654 and 1170 as amended.  We reject Villasenor's other claims of error, and affirm the judgment in all other respects.

FRANSON, J.

WE CONCUR:

HILL, P. J.

SMITH, J.